OPINION *Page 2 
{¶ 1} On December 5, 2006, the Stark County Grand Jury indicted appellant, Shawn Miller, on one count of burglary in violation of R.C.2911.12, one count of abduction in violation of R.C. 2905.02 and one count of assault in violation of R.C. 2903.11. Said charges arose from an incident wherein appellant arrived at the residence of his estranged wife, Jessica Miller, entered the residence without permission, removed the parties' two year old son, and fled.
 {¶ 2} A jury trial commenced on April 4, 2007. The jury found appellant guilty of abduction, but not guilty of burglary and assault. By journal entry filed April 11, 2007, the trial court sentenced appellant to four years in prison.
 {¶ 3} On April 19, 2007, appellant filed a motion for new trial. By judgment entry filed April 20, 2007, the trial court denied the motion.
 {¶ 4} Appellant filed an appeal and this matter is now before this court for consideration. Assignments of error are as follows:
 I {¶ 5} "THE TRIAL COURT ERRED BY ADMITTING EVIDENCE OF, AND ARGUMENT ABOUT, `OTHER ACTS' PROHIBITED BY EVIDENCE RULE 404."
 II {¶ 6} "THE TRIAL COURT ERRED IN ERRONEOUSLY INSTRUCTING THE JURY THAT A RESTRAINING ORDER FROM THE FAMILY COURT WAS IN EFFECT AT THE TIME OF THE ALLEGED OFFENSE." *Page 3 
 III {¶ 7} "THE TRIAL COURT'S FINDING OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."
 IV {¶ 8} "THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION FOR A NEW TRIAL."
 I {¶ 9} Appellant claims the trial court erred in permitting testimony concerning a prior incident wherein appellant took the child without consent. We disagree.
 {¶ 10} The admission or exclusion of evidence lies in the trial court's sound discretion. State v. Sage (1987), 31 Ohio St.3d 173. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983),5 Ohio St.3d 217.
 {¶ 11} Evid.R. 404 governs character evidence and states the following in pertinent part:
 {¶ 12} "(B) Other crimes, wrongs or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Page 4 
 {¶ 13} During trial, the prosecutor asked the child's mother, Jessica Miller, about a prior incident which had occurred on September 4, 2006. Vol. II T. at 27. The trial court interrupted and gave the jury a cautionary instruction on prior acts. Vol. II T. at 27-28. Ms. Miller then testified to a prior incident concerning appellant and the child which was very similar to the incident sub judice. In September of 2006, appellant took the child in violation of a restraining order, and later called Ms. Miller and told her she would never see the child again. Vol. II T. at 28-30. Eventually, the child was returned. Vol. II T. at 31.
 {¶ 14} We find the testimony clearly fell within the exception of Evid.R. 404(B). Appellant engaged in similar activity in contravention of a restraining order. Also, the testimony established appellant understood the meaning and effect of the restraining order.
 {¶ 15} Upon review, we find the trial court did not err in permitting the complained of testimony.
 {¶ 16} Assignment of Error I is denied.
 II {¶ 17} Appellant claims the trial court erred in instructing the jury that a restraining order issued by the Family Court was in effect at the time of the incident. We disagree.
 {¶ 18} Appellant argues the trial court's instructions determined an issue of fact and prejudiced him. Appellant further argues the restraining order was an "ex parte" restraining order and as such, was extraordinary relief that attempted to maintain the status quo. The incident sub judice occurred months after this restraining order. *Page 5 
 {¶ 19} State's Exhibit 8, the restraining order, was admitted into evidence. Ms. Miller testified the restraining order was "in effect throughout this case." Vol. II T. at 30. The trial court cautioned the jury as follows:
 {¶ 20} "It is necessary because of the questioning to tell you that the documents, Defendant's Exhibit A and B, et cetera, will speak for themselves, and Judge Howard's notation in item eight for example, of restraining order continues to temporary hearing date, merely because a temporary hearing was not held or requested by either party does not alter the judge's ruling until a temporary hearing is actually held. The fact that it was not held has no bearing upon the Court's or the jury's determination as to the effect of the restraining order under its terms." Vol. II T. at 83-84.
 {¶ 21} We find this instruction complied with Civ.R. 75(I)(2) which states the following:
 {¶ 22} "(I) Temporary restraining orders
 {¶ 23} "(2) Restraining order: grounds, procedure. When it is made to appear to the court by affidavit of a party sworn to absolutely that a party is about to dispose of or encumber property, or any part thereof of property, so as to defeat another party in obtaining an equitable division of marital property, a distributive award, or spousal or other support, or that a party to the action or a child of any party is about to suffer physical abuse, annoyance, or bodily injury by the other party, the court may allow a temporary restraining order, with or without bond, to prevent that action. A temporary restraining order may be issued without notice and shall remain in force during the pendency of the action unless the court or magistrate otherwise orders." *Page 6 
 {¶ 24} Also, during jury deliberations, the trial court answered the following questions concerning the divorce order:
 {¶ 25} "1. Was the restraining order dated 6-7-06 in effect
 {¶ 26} "You have all the evidence to decide the effectiveness of the restraining order.
 {¶ 27} "2. Also the document dated Exhibit D, is the restraining order invalidated because #6 is not checked
 {¶ 28} "Any unchecked matters appearing on Exhibit D are not part of such order."
 {¶ 29} We find these answers to be correct statements of the law and also reflect the evidence as presented.
 {¶ 30} Upon review, we find the trial court did not err in its instructions to the jury regarding the restraining order.
 {¶ 31} Assignment of Error II is denied.
 III {¶ 32} Appellant claims his conviction was not supported by the sufficiency and manifest weight of the evidence. We disagree.
 {¶ 33} On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. State v. Jenks (1991), 61 Ohio St.3d 259. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Jenks at paragraph two of the syllabus, following Jackson v.Virginia (1979), 443 U.S. 307. On *Page 7 
review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (1983), 20 Ohio App.3d 172, 175. See also, State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."Martin at 175.
 {¶ 34} Appellant was convicted of abduction in violation of R.C.2905.02(A)(1) which states the following:
 {¶ 35} "(A) No person, without privilege to do so, shall knowingly do any of the following:
 {¶ 36} "(1) By force or threat, remove another from the place where the other person is found."
 {¶ 37} Appellant challenges the jury's verdict because of the failure to establish that he lacked the privilege to take the child as he was the child's natural father. Appellant argues the restraining order was temporary in nature, and was set to expire at the hearing pursuant to Civ.R. 75(I)(2). He further argues that during the time frame of the order, Ms. Miller had at times not enforced the order. Also, at the time of the incident, Ms. Miller and the child were not living at the address listed on the restraining order. *Page 8 
 {¶ 38} On October 29, 2006, appellant went to Ms. Miller's new residence and began arguing with her. Vol. II T. at 39-40. After Ms. Miller denied appellant visitation, he went to the child's room, grabbed the child, and the following ensued:
 {¶ 39} "A. At this point I don't really know what's going on. I don't know Shawn's motive. I don't know what is happening. There was times where Matthew would come over and he would tell the boys goodbye because he was leaving and going out of state and because he couldn't take this. And so I didn't know if maybe he was just telling Zachary goodbye again or he had done it quite a few times. But he was just sitting there with Zach in the chair.
 {¶ 40} "Q. What happened at that point?
 {¶ 41} "A. When he gets up out of the chair I started walking around the porch. He gets up out of the chair and he starts walking around the porch.
 {¶ 42} "Q. And then what happens?
 {¶ 43} "A. He is walking around making me nervous. And the whole time I'm like right beside him. And he starts to step down off my porch. And I tell him if he wants to see Zach — because by now he already has Zach in his hands — that he has to stay on my porch. And then he starts walking off my porch.
 {¶ 44} "Q. Where does he start walking?
 {¶ 45} "A. He starts walking around my driveway right here, kind of walking around and then he starts walking over towards the railroad tracks.
 {¶ 46} "Q. What are you saying, anything to him?
 {¶ 47} "A. I am telling him he needs to get back up on the porch.
 {¶ 48} "Q. Are you pretty upset at this point? *Page 9 
 {¶ 49} "A. Yes, because I don't know. I am scared. My stomach hurts. I have a very bad feeling that something bad is going to happen.
 {¶ 50} "Q. How is Shawn? Is he saying anything?
 {¶ 51} "A. He's just talking to Zach and he pretty much is telling me to be quiet or whatever. But as he starts walking, you know, towards the tracks Zach at this point is saying I want my mommy.
 {¶ 52} "Q. What happens next?
 {¶ 53} "A. Shawn had parked my car. He had my vehicle in front of the house. And so then he starts walking down the driveway with Zach holding him and he looks at me and I am following him. He says Zach wants to see the car.
 {¶ 54} "Q. Showing you State's Exhibit 2A. Do you see in the photograph where the car was parked?
 {¶ 55} "A. Yes. It was parked right about there (indicating).
 {¶ 56} "Q. Okay. What happens then?
 {¶ 57} "A. He starts walking towards the car and I am telling him that he needs to stay at the house with Zach. And at this point he gets to the car. He uses the remote. He unlocks the car, puts Zach in the driver's side and shut the door and locks it.
 {¶ 58} "Q. What are you doing then at this point?
 {¶ 59} "A. At this point I am standing outside of the car with Shawn arguing.
 {¶ 60} "Q. Then what happens?
 {¶ 61} "A. At this point we are fighting pretty badly. Zach is in the car screaming that he wants his mother, wants his mommy. His face is red. His fists are clenched. He doesn't want to go with his dad. *Page 10 
 {¶ 62} "Q. And what are you and Shawn doing at this point?
 {¶ 63} "A. We're fighting. I'm kind of pushing him. He is pushing me. I am trying to keep him away from the car so that he doesn't get in the car and take off.
 {¶ 64} "Q. Describe what happens next.
 {¶ 65} "A. We are outside of the car and we're arguing and he is saying that I am making him act that way and that I make him do things like this, and that's when he says before it's all said and done with Zachary will have not (sic) any parents.
 {¶ 66} "Q. What are you saying?
 {¶ 67} "A. I'm telling him I want my kid back and to get him out of the car.
 {¶ 68} "Q. Are you still standing outside the vehicle?
 {¶ 69} "A. Yes.
 {¶ 70} "Q. What happens next?
 {¶ 71} "A. Before it is — we are still arguing. He goes around to the driver's side and I am trying to keep him from getting in the car. And he unlocks the car, gets in the passenger side, I'm sorry, and shuts the door and locks the car and kind of moves over to the driver's side and Zach is on his lap.
 {¶ 72} "Q. What are you doing at this point?
 {¶ 73} "A. I was telling him that he is not taking off with my kid and telling him not to leave, you know, and he kind of starts the car and cracks the window and Zach is just screaming bloody murder like he doesn't want anything to do with Shawn.
 {¶ 74} "Q. Then what happens?
 {¶ 75} "A. He had rolled the window down and Zach was reaching his little hand out and I am touching his hand like he was reaching for me and I am crying. I am just *Page 11 
touching him because I can't get to him and at that point he is still crying. Shawn puts him in the back, puts him in the car seat. I don't know if he buckled it, but he put the thing down and he starts to take off.
 {¶ 76} "Q. What are you doing at this point?
 {¶ 77} "A. I have my hand in the window trying to stop. I am trying to get in the car, trying to do what I can, but I couldn't do it.
 {¶ 78} "Q. What did you end up doing?
 {¶ 79} "A. He takes off and I was going to go to the house and call the police, but my cousin Missy had already started. She had already called the cops.
 {¶ 80} "Q. Do you see what direction the vehicle traveled from your house?
 {¶ 81} "A. Yes. He comes up this road because it goes around in a circle so he comes up this way and he comes out the back. I mean, I was chasing him up this way, but I didn't keep up with him, with a moving vehicle." Vol. II T. at 41-46.
 {¶ 82} Thereafter, appellant called Ms. Miller on the phone, asking to meet her. Vol. II T. at 48. Ms. Miller got into her vehicle and followed appellant's instructions as to where to meet him, eventually arriving at his parents' house. After observing that the police were following Ms. Miller, appellant fled in his vehicle. Vol. II T. at 50. An Amber Alert was broadcast and appellant eventually left the child at his aunt and uncle's home. Vol. II T. at 53.
 {¶ 83} Because of the prior incident, appellant was clearly aware of the validity of the restraining order. Further, his actions in fleeing upon observing the police established that he knew he was violating the order. *Page 12 
 {¶ 84} Upon review, we find sufficient, credible evidence that appellant took his child without privilege to do so because of the restraining order, and find no manifest miscarriage of justice.
 {¶ 85} Assignment of Error III is denied.
 IV {¶ 86} Appellant claims the trial court erred in denying his motion for a new trial. We disagree.
 {¶ 87} The granting of a new trial lies in the trial court's sound discretion. State v. Petro (1974), 148 Ohio St. 505; Blakemore.
 {¶ 88} Crim.R. 33 governs motion for new trial. Appellant filed his motion under subsection (A)(1) which states the following:
 {¶ 89} "(A) Grounds
 {¶ 90} "A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:
 {¶ 91} "(1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial."
 {¶ 92} Appellant based his motion on the trial court's instructions on the validity of the restraining order. Consistent with our decisions in Assignments of Error II and III, we overrule this assignment.
 {¶ 93} Assignment of Error IV is denied. *Page 13 
 {¶ 94} The judgment of the Court of Common Pleas of Stark County, Ohio is hereby affirmed.
 Farmer, J. Gwin, P.J. and Edwards, J. concur. *Page 14 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Stark County, Ohio is affirmed. *Page 1